In the Matter of the Application of THE CITY OF NEW YORK, etc., Relative to Acquiring Title to Lands, etc., on Upper New York Bay, between Simonson Avenue, Clifton, and Arrietta Street, Tompkinsville, in the Borough of Richmond, City of New York, Pursuant to a Certain Plan Determined upon by the Commissioner of Docks on March 27, 1919, and Approved and Adopted by the Commissioners of the Sinking Fund on May 8, 1919.

THE CITY OF NEW YORK, Appellant; THE STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY and Others, Respondents.

Second Department, January 15, 1926.

Eminent domain — proceeding by city of New York to condemn lands and lands under water on east shore of Staten Island — question involved as to title to lands under water within projected lines of streets and between old and new pierhead lines — respondents' predecessors had grants to said land extending to old pierhead lines established in 1857 (Laws of 1857, chap. 763) — in 1897 Commissioners of Land Office ordered letters patent issued to then owners to new pierhead lines established by Laws of 1895, chap. 898 — patents were not issued until after Greater New York charter took effect, January 1, 1898 — Greater New York charter, §§ 83 and 85, granted lands under water to New York city within projected lines of any street intersecting shore line then laid out or thereafter laid out but subject to private rights — owners of land under said street to old pierhead lines had, under orders of Commissioners of Land Office, rights in lands to new pierhead lines prior to January 1, 1898 — city of New York did not acquire title to lands between old and new pierhead lines — provision in deed to owners' predecessor that certain streets should remain open, estopped present owner from claiming abandonment — street running to west side of older shore street extends also across said street to shore line — findings that streets did not intersect shore lines reversed — since streets intersected shore line city had easement for street purposes over lands under water between new and old pierhead lines within projected lines of streets.

In proceedings by the city of New York to condemn certain lands and lands under water on the east shore of Staten Island within the projected lines of

streets alleged to intersect the shore line, in which the question involved is the title to lands within said lines between the old pierhead line and the new pierhead line, the city cannot successfully claim title to said lands under water within the projected lines of said streets and between the two pierhead lines, since it appears that the respondents' predecessors in title received grants from the State of New York between 1816 and 1861 to lands under water within the projected lines of said streets; that in 1857, by chapter 763 of the laws of that year, pierhead lines were established and riparian owners were permitted to fill in those lines; that by chapter 898 of the Laws of 1895 new pierhead lines were established beyond the old ones, and in 1897 the Commissioners of the Land Office granted the applications of the several respondents for a grant of land under water within the projected lines of said streets and between the old and new pierhead lines, but the letters patent were not issued until after January 1, 1898, when the Greater New York charter took effect, which under sections 83 and 85 granted to the city of New York all lands under water within the projected lines of streets intersecting the shore line, subject, however, to private rights or existing riparian rights of owners of private property.

While the letters patent granted in 1898 did not relate back as against the city of New York to the date when the Commissioners of the Land Office granted the applications of the respondents therefor, still, when the Greater New York charter took effect, the respondents did have private rights in the land in question which were protected by section 85 of the Greater New York charter, and the fee of the said lands vested in the respondents and did not pass to the city of New York by virtue of the Greater New York charter.

However, the city of New York, under the rule that where a street intersects a shore line a public easement arises over lands under water within the projected lines of the street, had an easement over said lands under water within the projected lines of the streets in question if said streets intersected the shore line.

A provision in the deed to the predecessor of one of the respondents that one of the streets in question in this proceeding was to remain and be kept open as a public street or road as laid out on a certain map, estopped the present owner from contending that said street had been abandoned by reason of its own acts in obstructing the street.

One of the streets which apparently ended at the west side of a street running parallel with the shore, intersected the shore line, since the public easement in the shore street at the point of intersection may be treated as a part of the easement of the intersecting street.

The findings by the court that the several streets did not intersect the shore line are contrary to the evidence and are reversed.

Since all of the streets did intersect the shore line, the city of New York has an easement or right of way over the lands under water within the projected lines of said streets and between the old and new pierhead lines.

Appeal by the petitioner, The City of New York, from an order of the Supreme Court made at the Kings Special Term and entered in the office of the clerk of the county of Richmond on the 28th day of March, 1924, dismissing the claim of title made by the city of New York to certain lands under water within the projected lines of Simonson avenue, Vanderbilt avenue, Hannah street and Arrietta street on the east shore of Staten Island out to the pierhead line fixed by chapter 898 of the Laws of 1895.

*Henry W. Mayo* [*George P. Nicholson, Corporation Counsel,* with him on the brief], for the appellant.

*A. S. Gilbert* [*Royal E. T. Riggs* with him on the brief], for the respondents, The Staten Island Rapid Transit Railway Company and others.

Young, J. This proceeding was instituted by the city of New York to acquire certain lands and lands under water located on the east shore of Staten Island from the north line of Arrietta street, in Tompkinsville, to the south line of Simonson avenue, Clifton, in accordance with the plan adopted by the commissioner of docks on March 27, 1919, and approved by the commissioners of the sinking fund on May 8, 1919.

The respondents Staten Island Rapid Transit Railway Company, New York Transit and Terminal Company, Ltd., and Staten Island Railway Company claimed title to various parcels of land under water, and introduced proof of their title to such lands under water.

The city of New York also claimed title to lands under water within the projected lines of various streets, viz., Simonson avenue, Vanderbilt avenue, Hannah street, Arrietta street, Minthorne street, Guyon street, Swan street and St. Julian place — eight streets in all. At the trial the city's claim concerning Guyon and Swan streets and St. Julian place was withdrawn. No error is claimed by the city to the court's finding against the city as to Minthorne street. The appeal is limited, therefore, to the city's claim of title to lands under water within the projected lines of Simonson avenue, Vanderbilt avenue, Hannah street and Arrietta street.

Pursuant to section 1000 of the Greater New York charter,* the court determined the questions of law and fact in favor of the respondents and entered an order or decree by which the court (1) severed the claim of the city of New York to title to lands under water within the projected lines of Simonson avenue, Vanderbilt avenue, Hannah street, Minthorne street and Arrietta street from all other claims in the proceeding; and (2) after making findings of fact with reference thereto, dismissed all of the claims of the city of New York to the lands within the projected lines of the streets just named. From this order the city of New York appeals.

At the outset, appellant questions the jurisdiction of the court below to make the order appealed from. But the ruling of the Court of Appeals on the appeal of the Symes Foundation in this

---

* Added by Laws of 1915, chap. 606; since amd. by Laws of 1925, chap. 633.— [Rep.

proceeding (*Matter of City of N. Y.* [*Staten Island Proc.*], 237 N. Y. ·275) seems to me conclusive against this contention.

The claim of title of the city of New York is based upon the language of section 83 of the Greater New York charter,* which provides, among other things, that the city shall have control, as provided in the act, of the waterfront of the entire city, " subject, however, to the rights of private owners of property," and also power to establish, construct, acquire, own, maintain and enjoy all ferries, public wharves, docks, piers, etc., and all other public structures, adjuncts and facilities necessary or proper for the navigation, intercourse and commerce, foreign and domestic, of the city. It then provides as follows: " To these ends, in addition to all other grants, there is hereby granted in fee to the said city of New York, as herein constituted, in all the public streams, rivers, sounds, bays and waters of all descriptions at any and all places within said city or adjoining the limits of said city as herein constituted, all and singular the property, estate, right, title and interest of the people of the state of New York, in, to, of, and concerning such lands and soil covered by water, as are embraced within the projected boundary lines of any street intersecting the shore line, and which street is in public use or which may be hereafter opened for public use, extending from high-water mark out into said streams, rivers, sounds, bays and waters so far (any limits in existing grants to the contrary) as the said city shall now or at any time hereafter in the opinion of its municipal assembly, or department of docks and ferries require the same for ferries, public wharves, docks, piers, bulkheads, basins, slips, or other public structures, adjuncts and facilities for navigation and commerce, including the right for such purposes to reclaim such lands from said waters, and including also all riparian rights, and all rents, issues and profits of the premises herein granted."

Section 85* provides as follows: " This grant shall not impair or affect any existing valid private rights, or the existing riparian rights of owners of private property, or the lawful rights of private owners of docks, piers and other structures in the said city or any part thereof."

Section 86* provides that after the approval of this act, " no patent of soil or land under water within The City of New York, as herein constituted, shall be made except to The City of New York or to the riparian proprietor." It then provides for the granting to the city by the Commissioners of the Land Office of lands under water " between street intersections as aforesaid," and that

---

* Laws of 1897, chap. 378, re-enacted by Laws of 1901, chap. 466.— [REP.

the Commissioners of the Land Office shall thereupon give notice to the riparian proprietor before taking any action in the matter. " Such grant, however, shall be subject to all the rights of the riparian proprietor."

The respondents claim title to these lands under water under certain grants made by the State. The lands under water at the foot of Simonson avenue were granted to one Jeremiah Simonson by two grants in 1860 and 1861, extending from the high-water line 600 or 700 feet out into the bay. Those at the foot of Vanderbilt avenue, extending from high-water mark out 500 feet into the bay, were included within the limits of a grant made by the State of New York to one Corson in 1817. Those at the foot of Hannah street were included within the limits of a grant to St. Andrew's Church made in 1816, extending 500 feet out into the bay; and those at the foot of what is now Arrietta street were granted to the Richmond Turnpike Company in 1816, extending 500 feet out into the bay. These grants were thereafter acquired by the respondents, the grants affecting the lands under water at the foot of Simonson avenue and Vanderbilt avenue by the Staten Island Railway Company, those at the foot of Hannah street by the New York Transit and Terminal Company, and those at the foot of Arrietta street by the Staten Island Rapid Transit Railway Company.

By chapter 763 of the Laws of 1857 the State established bulkhead and pierhead lines on the east shore of Staten Island and permitted the riparian owners to fill in to the bulkhead and pierhead lines as therein provided. By chapter 898 of the Laws of 1895 the State fixed new bulkhead and pierhead lines, and provided that the riparian owners might fill in in like manner as therein provided. This act also gave owners of interior grants the right to apply to the Commissioners of the Land Office and receive grants of lands under water lying between the exterior line of their water grants and the pierhead line therein established. Applications were thereupon made by the respondents, the Staten Island Rapid Transit Railway Company, the Staten Island Railway Company and the New York Transit and Terminal Company, Ltd., for grants of land under water between the exterior lines of the early grants given to their predecessors in title and the pierhead line established by chapter 898 of the Laws of 1895. These applications were granted, and on September 30, 1897, letters patent were ordered issued to the Staten Island Railway Company of lands under water which included those within the lines of Simonson avenue and Vanderbilt avenue as extended to the pierhead line of 1895. These letters patent are dated April 28, 1898, and December 20, 1898. On September 30, 1897, similar letters patent were

ordered issued to the New York Transit and Terminal Company, Ltd., for the lands under water including those within the projected lines of Hannah street. These letters patent are dated December 8, 1898. On July 29, 1897, letters patent were ordered issued to the Staten Island Railway Company for lands under water between the exterior line of the Richmond Turnpike Company grant at the foot of Arrietta street, extending to the pierhead line of 1895. These letters patent are dated April 28, 1898.

The Greater New York charter* took effect on January 1, 1898, and on that day, the respondents contend, title to the lands under water, including those within the projected lines of the streets in question, had already vested in them by virtue of these grants, and that, therefore, there was no title left in the State which could be the subject of a grant to the city.

The earlier grants in 1816, 1817, 1860 and 1861 were certainly made before the Greater New York charter took effect, and if respondents' contention is sound, these earlier grants would prevent the vesting of any title in the city under section 83 (*supra*).

The appellant, however, claims title only for the lands under water within the projected lines of the streets in question from the easterly or outshore line of these early grants. It does not claim title to the lands under water within the projected lines of said streets as they extend through these early grants. It asserts that each of these streets was a public highway, and, on January 1, 1898, when the charter took effect, and for many years prior thereto, they intersected the line of high water or the shore line of New York bay on the east shore of Staten Island, and that the easement of such streets extended easterly through the lands under water granted to the respondents' predecessors in title, and that, therefore, the city of New York, by section 83 of the charter, was granted the lands under water within the lines of these projected streets from the easterly side of the ancient grants out to the pierhead line. Various reasons are given for this contention, but, as I view this case, it will be necessary to consider but one, and that is the principle of law that where a highway terminates at the high-water line of navigable waters, the lands under water contiguous to the street terminus are subject to the easement essential to a public highway; that the public had a right to pass directly from the street to such waters and from such waters to the street, and whenever, under lawful ownership or authority, the waters bounding the end of a street are displaced by earth or other filling or a wharf or other structure is built out from the street into the waters, the easement

* Laws of 1897, chap. 378, re-enacted by Laws of 1901, chap. 466.— [REP.

14

of the street is extended by operation of law to the end of the filling or the structure. (*Matter of City of New York* [*Main Street*], 216 N. Y. 67, and cases cited.) The case above cited involved the ownership of lands under water at the foot of Main street on City Island in the city of New York. Like the case at bar, it was a condemnation proceeding, and the lands under water were claimed by virtue of an ancient royal grant made in 1763. The court held in conformity with the above principle that, notwithstanding this grant, these lands under water were subject to the easement of the street terminating at the water's edge. In *City of Buffalo* v. *D., L. & W. R. R. Co.* (190 N. Y. 84) this principle was discussed and the court said: " What is the situation according to the findings when properly classified? About 1826 a public highway existed on the river front between Washington and Main streets. It still existed in 1838, when a dock was built by the abutting owners over and upon the land owned by them constituting said highway, covering it for its entire width and length. * * * Under these circumstances what became of the street when the dock was built? Can abutting owners destroy a street in this way? Did the construction of the dock annihilate the highway? There is no statute which gives it that effect, and according to the common law the street leaped from the ground to the dock and stayed there. It is there now unless it has been abandoned by nonuser as we read the authorities."

The court then cited and quoted from *People* v. *Lambier* (5 Den. 9) as follows: " It is entirely settled that these alluvial additions become the property of the owner of the land against which the deposit is made; * * * and it would hardly admit of a question that in such a case a public street leading to navigable waters would keep even pace with the extension of the land, so as to preserve an unbroken union between the easement on land and that on such navigable waters. And if this consequence would follow from a change in the land by the action of natural causes, we think it must also be held to follow from one made by the immediate and voluntary act of the owner of the land on the shore in its original condition."

The court continued: " When a private dock is built over a public street upon the shore of navigable waters, the dock becomes part of the street and the public has a right to travel over it. Ownership of the dock is not inconsistent with the existence of the street any more than ownership of the land over which the street extended. Assuming that the defendant or its predecessors could lawfully build a dock over their own land in order to reach the river, still, as their land was subject to the right of the public to travel upon it, they

could not unreasonably interfere with that right nor with the existence of the street, which was the foundation thereof. Two rights coexisted. The defendant, as owner of the river front, had the right to reach the water. As there was a street along the river front over the defendant's land the public had the right to use the street. The building of the dock changed neither right. Both continued to exist, although under changed conditions. They met but did not merge, nor did either destroy the other. The defendant had the right to use its dock, as a private dock, subject to the right of the public to travel over it, as they had previously traveled upon the land over which it was built. The city had no right to use the dock for dock purposes, but its citizens had the right to use it for street purposes. * * * The easement for travel still existed, but it was over the dock which took the place of the land constituting the street."

Appellant also claims that by reason of this principle of law and the construction given by the courts to section 83 (*supra*) in *Matter of McClellan* (146 App. Div. 594; affd., on the opinion below, 204 N. Y. 677) these streets, on the taking effect of the Greater New York charter, were extended through the ancient grants and were within the meaning of section 83.

In *Matter of McClellan* (*supra*) there was involved a question of title to lands under water at the foot of Joralemon street in Brooklyn. The New York Dock Company claimed the title to these lands in fee. This claim of title was based upon a grant made by the State in 1902. This grant, however, by its terms, was made " subject to such right, title and interest as The City of New York has under the provisions of its Charter to lands under water in front of projected streets," and excepted such title from the grant and reserved it to the city. The court then quoted the provision of section 83 (*supra*) and held that whether this section be considered as a completed grant, it certainly amounted to permanent appropriation to the city of New York of all the lands under water described therein and it was no longer within the power of the Commissioners of the Land Office to make any grants in fee or otherwise inconsistent with the provisions of that section. The court then said: " It is argued, however, that the section of the statute above quoted did not apply to Joralemon street, as that is said not to have intersected the shore line, nor to have extended from high-water mark, and that, therefore, its lines could not be ' projected ' out into the waters of the East river, in the meaning of the statute. This argument is of supreme importance, because the route of the subway as constructed lies largely within limits, between piers 17 and 18, which would form extensions of boundary lines of Joralemon

street from the shore line out into the river. The argument is based upon a further contention that Joralemon street actually ends above high-water mark, or the shore line, and that the dock company owns two parcels of land intercepting its further progress to high-water mark. It is then argued that the lines of the street cannot be considered as ' projected ' into the water of the river, because such lines would pass through private property in order to reach high-water mark. This interpretation of the statute seems too narrow. The statute applies by its express terms, to ' any street intersecting the shore line, and which street is in public use or which may be hereafter opened for public use.' The ' projected boundary lines ' described by the statute would, therefore, embrace the boundary lines of a street then laid out as intersecting the ' shore line,' although a portion of it had not been actually opened for public use, for, as it declares expressly, it has relation to such a street ' which may be hereafter opened for public use.' "

It is claimed by the respondents, however, that section 83 could not apply to the lands under water claimed by the city in this proceeding, because when the charter took effect the State did not own the land under water within the projected lines of the streets in question, " beginning at high water." In other words, the argument is that because, when the charter took effect, the State did not own the lands under water in front of the streets in question, it could not, therefore, grant to the city any title to such lands extending from such high-water mark, and that, therefore, no title vested in the city to the lands under water in front of said streets and extending out from the exterior line of the intervening lands under water already granted by the State to respondents' predecessors in title. If it were necessary in this case to determine this question, its solution would present a rather perplexing problem. It should be observed, however, that this argument ignores the common-law principle laid down in *Matter of City of New York* ·(*Main Street*) (*supra*) and other cases, extending the public easement of a street over the lands under water in front thereof, even though already granted by the State to a private owner. It also, it seems to me, ignores the effect of the decision in *Matter of McClellan* (*supra*) to the effect that this grant made by the State under section 83 of the charter to the city covers not only streets opened to the shore line, but also those which have been laid out to that point, although not actually opened. It may be that the true construction of the provisions of section 83 of the charter, as applied to this situation, is that the common-law easement referred to would be equivalent to the laying out of the street through the intervening lands under water owned by· the respondents. In other

words, if these intervening lands had been filled in to the exterior line of the grant, the easement of the street would have continued over such filled-in lands to a resulting new high-water line, and that, therefore, the title granted by the charter to the city would have vested. It might then be held that although the lands had not been filled in, the same principle might be applied.

If, however, respondents' contention in this respect is sound, it follows that their somewhat narrow construction of section 83 prevents any grant by the State of these lands under water in front of the streets in question. If it is not sound, it becomes important to determine whether the letters patent granted to the respondents, which are dated in 1898, will relate back, as contended by them, to the dates in 1897 when these grants were ordered by the Commissioners of the Land Office. I am inclined to doubt whether there can be any such relation back to a prior date as against the city of New York. As was stated in *Heath* v. *Ross* (12 Johns. 140), this doctrine is a mere fiction of law and " is never to be adopted when third persons, who are not parties or privies, will be prejudiced."

It does not follow, however, that these grants to respondents cannot be upheld as against the city. Under section 85 of the charter, the grant made by section 83 does not impair or affect any existing, valid, private rights or the existing riparian rights of owners of private property. While these riparian rights would not include the mere right of the owner of uplands to apply and receive a grant of lands under water, I think that they would include the right of an applicant for such a grant to have letters patent issued where such letters patent had been ordered by the Commissioners of the Land Office before the charter took effect, and, in my opinion, therefore, the grant to the city, under section 83, was subject to this right, and the fee of the lands in question, therefore, vested in respondents, subject, however, to the common-law easement of the streets intersecting the shore line to the same extent as the earlier grants to the respondents' predecessors in title.

It will be noted, therefore, that, in any aspect of the case, the same result will ensue, and that, by no reasonable construction of the charter provisions above quoted, could the city of New York have acquired title in fee to the lands under water in front of the streets in question.

But, assuming that these streets, on January 1, 1898, when the charter took effect, intersected the shore line, the easement of such streets will extend over the lands granted by the State to respondents and their predecessors in title, and such lands will be subject to a perpetual easement for street purposes, within the projected

boundary lines of such streets. Of course, if these streets, at that time, did not intersect the shore line, no such easement would result.

The learned Special Term, after taking a vast amount of testimony and documentary evidence, including a large volume of maps, made certain findings in a memorandum handed down in deciding this case. These findings in their final form appear in the order appealed from. It finds: (1) That Simonson avenue never extended to the shore line of New York bay, but stopped at the westerly line of Bay street; (2) that Vanderbilt avenue did not, on January 1, 1898, intersect the shore line, and that Vanderbilt avenue east of Bay street was not, on January 1, 1898, in public use and had not been in public use for more than six years prior thereto; (3) that Hannah street never extended to the shore line of New York bay, but stopped at the westerly line of Bay street; (4) that Arrietta street did not, on January 1, 1898, intersect the shore line; that it never extended beyond a certain fence cutting off the dock of the ferry company from Arrietta street; that the public never acquired an easement in Arrietta street for street purposes beyond said fence between the dock of the ferry company and Bay street.

Vanderbilt avenue appears to have been laid out as a public street about 1835. It was recognized as such in a deed made by Henry Dudley and wife to Francis Salmon and Peter Stuyvesant, dated November 25, 1835. These parties were predecessors in title to the respondent Staten Island Railway Company, and, at that time, they owned the so-called Corson grant of the lands under water in front of the uplands affected by this deed. This deed conveyed property on both sides of a street shown as Corson avenue on a map annexed to the deed. It is conceded that this Corson avenue was afterwards named Vanderbilt avenue. This deed contained a covenant to the effect that " Coursen avenue is to remain and be kept open as a public street or road as laid out on said map." This map showed Corson avenue extending to the shore line.

It would be impossible to review in detail within the reasonable limits of this opinion the vast amount of oral and documentary evidence offered by the parties concerning Vanderbilt avenue. It seems to be conceded that at some time this avenue did run to the water, but there was a large amount of conflicting testimony as to whether it had not been abandoned more than six years before January 1, 1898. This evidence of abandonment consists of testimony of a number of witnesses called by the respondents to the effect that about 1888 the respondent Staten Island Railway Company built station platforms and a car repair shop across Vander-

bilt avenue, completely blocking access to the water.  On the other hand, the appellant produced a large number of witnesses who contradicted respondents' witnesses in this respect, and, according to their testimony, there were, on January 1, 1898, no buildings constructed across Vanderbilt avenue, and that the station platform at that time extended only to the southerly side of the street and not across it; that in 1904 the railway company built a new station and extended its platform across the street, but that until that time the street was open and afforded free access to the water by the public, and was so used.  It cannot be said, therefore, that this finding has no support in the evidence, or that it is against the weight of evidence.  We should not, therefore, disturb it.

But, aside from the question of fact, appellant claims that, by reason of the covenant in the deed above referred to, that Corson avenue (afterwards Vanderbilt avenue) should remain open as laid out on the map annexed to the deed, showing it extending to the water, the respondent Staten Island Railway Company is precluded from claiming any abandonment of the street resulting from its own acts because it derived its title through this deed and is, therefore, bound by the covenant.  (Citing *Mayor, etc., of City of New York* v. *Law*, 6 N. Y. Supp. 628; affd., 125 N. Y. 380.)  In that case the city granted to one Hall certain lands under water, and Hall covenanted to build certain streets when required and to forever maintain them as public streets.  The defendant claimed title through mesne conveyances from Hall and also claimed title by adverse possession of a portion of East Tenth street, which was one of the streets mentioned in the covenant.  It was held by the referee that the grantee under an instrument by the terms of which portions of the land were excepted for public streets, which the grantee had covenanted to make and keep in repair for public use, could not by any occupation thereof acquire an absolute right as owner in opposition to the words and clear intent of the instrument under which he took title.  The Court of Appeals expressly approved this holding of the referee (125 N. Y. 394).  The case last cited, however, related to the question of adverse possession as a means of acquiring title.  It did not concern the question of abandonment of a highway, under section 234 of the Highway Law.  Of course, the Staten Island Railway Company had the title in fee of the bed of the street.  By its acts in obstructing the street it attempted to destroy the easement.  Did this covenant in the deed through which it derived title constitute an estoppel to its claim of abandonment?  I am unable to see any good distinction in principle between the case at bar and that of *Mayor, etc., of City of New York* v. *Law* (*supra*).  In that case Law was held to be

estopped to assert title by adverse possession by the covenant in the deed through which he derived title. Why may not the respondent railway company, on the same principle, be estopped by the covenant in the deed through which it derived title, to assert the abandonment and destruction of the easement of the street by its own acts? In the *Law* case the covenant was to build and maintain the streets as public streets. In the case at bar the covenant was that Corson avenue (now Vanderbilt avenue) should " remain   *   *   *   open as a public street or road." That the railway company's obstruction of the street was a violation of this covenant seems plain, and, as there is no other evidence of abandonment, in my opinion, the doctrine laid down in *Mayor, etc., of City of New York* v. *Law* (*supra*) should be applied, and Vanderbilt avenue be held not to have been abandoned on January 1, 1898, but to have run to the water. This finding should, therefore, be reversed.

Simonson avenue was first laid out or recognized as a street going to the water in a deed dated February 6, 1839, between Charles and Mary McSimonson and Cornelius Simonson. This deed recites an avenue or road opened partly on land of McSimonson and partly on land of Simonson " extending from the shore of the bay of New York " on land of the aforesaid parties, and grants to Simonson and to his heirs and assigns forever a right to pass and repass at all times forever thereafter on the same avenue and reserves to McSimonson and his wife and their heirs and assigns forever a similar right to use said avenue. The appellant's witness Van Horne, city surveyor, testified that the lines of the road mentioned in that deed are coincident with those of Simonson avenue shown on the damage map. There does not seem to be any dispute as to this.

Bay street, as it at present exists, runs north and south along the water's edge, and the present maps show Simonson avenue running into it from the west. Bay street was formerly known as the River or Shore road, and it originally was but two rods or thirty-three feet wide. In 1856 this Shore road was laid out to a width of sixty-six feet or four rods wide and became known as Bay street. According to Van Horne's testimony, the easterly line of the original Shore road before it was widened was east of the present east or out-shore line of the present Bay street, and between the said easterly line of the original road and the line of high water there was some upland.

Appellant also put in evidence the judgment roll in a foreclosure action, attached to which was a map which shows Simonson avenue extending to the water. This judgment roll was filed on May 17,

1863. The referee in that action conveyed the property in accordance with this map to Jacob H. Vanderbilt by deed dated June 12, 1863. In that deed a parcel of land designated on the map B is " bounded northwesterly by said Simonson Avenue, northeasterly by the Bay of New York," etc. This parcel is also designated on the map as Bay street, although that street is not mentioned in the deed. It is upon this map and deed and the deed between McSimonson and Simonson that the witness Van Horne based his testimony above referred to.

The witness Grunenthal, who was a surveyor, testified that the relation of the space represented by the intersection of Bay street and Simonson avenue is that they met at the water's edge; that there was a storm water runoff constructed in Simonson avenue which terminated in a rough riprap bulkhead on the easterly line of Bay street.

This Shore road or Bay street is a more ancient road than Simonson avenue, and the finding of the learned Special Term would seem to be based upon the fact that Simonson avenue could only run to the west side of Bay street because at the time it was laid out the Shore road or Bay street was then in existence at the water's edge, and, therefore, Simonson avenue could not cross it. I can see no other explanation for the finding that Simonson avenue never went to the water, but stopped at the westerly side of Bay street. I cannot agree with this narrow interpretation of the deed or grant by which Simonson avenue was originally laid out. It is expressly stated in that grant that this road which later became Simonson avenue extended " from the shore of the bay of New York," and I see no reason why it could not have intersected the shore, even though the Shore road or Bay street was then at the water's edge. In any event, in my opinion, at that point of intersection, there exists a public easement in the land abutting the end of Simonson avenue, and this public easement may be treated as a part of Simonson avenue as well as of Bay street. This finding with respect to Simonson avenue should, therefore, be reversed.

As to Hannah street, I am unable to understand upon what basis the finding of the learned Special Term rests. That finding is that Hannah street never extended to the shore line of New York bay, but stopped at the westerly line of Bay street. Many maps were put in evidence in behalf of the appellant showing that Hannah street did extend to the water. Indeed, the map or survey made in November, 1897, annexed to the application by the respondent New York Transit and Terminal Company for a grant of land under water, letters patent for which were made on December 8, 1898, shows Hannah street extending from the east side of Bay

street to the water.  The finding of the learned Special Term, made in its memorandum of decision, was that Hannah street was closed in 1911 pursuant to a resolution of the board of estimate and apportionment of New York city.  This part of the finding does not appear in the order appealed from, and I do not see how such a fact could have any effect upon the situation on January 1, 1898.  The right or title of the city of New York, under section 83 of the charter, must be determined as of the date when that charter took effect, and could not be affected by any action of the city authorities subsequent to that time.  Indeed, as argued by appellant's counsel, if Hannah street existed in 1911, and was then closed by the city, it clearly must have existed prior to that time.  The map shows the portion of Hannah street intended to be closed as running from the easterly side of Bay street to the trestle of the Staten Island Railway Company.

A large amount of evidence, however, was introduced on the part of the respondent that, between 1893 and 1896, the railway company had filled in the lands under water at the foot of Hannah street, between its trestle opposite that street, and the shore line at Hannah street.  A great deal of evidence in contradiction of this fact was offered by the appellant.  It is unnecessary to consider this evidence in detail.  Assuming that this fill was made, it would not constitute an abandonment of the street, because it was not made earlier than 1893, and, therefore, could not have existed more than five years before January 1, 1898.  This finding must also be reversed.

As to Arrietta street, the finding of the Special Term is that it did not, on January 1, 1898, intersect the shore line, and that it never extended beyond a certain fence, cutting off the dock of the ferry company from Arrietta street, and that the public never acquired any easement in that street for street purposes beyond said fence between the dock of the ferry company and Bay street.  Every map put in evidence relating to Arrietta street shows it running to the water.  Indeed, there was, in effect, a concession by respondents' counsel that it did so extend to the water.  At all events, there was a statement that respondents would offer no evidence to dispute that fact, and, in fact, none was offered.  The only evidence relating to any fence was given by witnesses called by the appellant.  The witness Harry R. Denys testified that at one time a little picket fence was put up there, and that lots of times it was broken away.  He also testified to certain gates maintained by the ferry company which were on the dock and which were closed when the boats were not at the dock, and that, west of these gates, there was a platform on piles under which the water came,

and that these gates were east of the water line, and that there was nothing to obstruct the public in going down Arrietta street eastward to the waters of the bay, and that there was continuous traffic there. There was also testimony by other witnesses, relating to the gates, similar to that above.

There is no evidence in the case to contradict these witnesses, nor were they cross-examined on the subject by respondents' counsel. Indeed, the only evidence relating to any fence at Arrietta street is that given by the witness Denys, and it does not appear just where this fence was. No other witnesses testified to any fence on Arrietta street at the dock or in any other place on that street, and the testimony of Denys was simply that it was a little picket fence which was many times broken away. Nor does it appear when that fence was put there nor when it was broken down. It seems to me clear that this evidence was entirely insufficient to sustain the burden of proof upon the respondents that there was any abandonment of Arrietta street. This finding must also be reversed.

It follows, therefore, that so much of the order as makes findings of fact relating to these streets should be reversed, and the remainder of the order should be modified so as to adjudge that the title in fee to the lands under water in question is in the respondents, but is subject to the easement for street purposes in the city of New York; and as modified affirmed, without costs.

KELLY, P. J., RICH, MANNING and KAPPER, JJ., concur.

The order appealed from, so far as it makes findings of fact concerning Simonson avenue, Vanderbilt avenue, Hannah street and Arrietta street, is reversed on the law and the facts, and this court finds that the said streets and avenues above named did, on January 1, 1898, at the time the Greater New York charter took effect, intersect the shore line of New York bay and that the same had never been abandoned prior to that time. The order appealed from is further modified so as to adjudge that the title in fee to the land under water, in question, is in the respondents but is subject to an easement for street purposes in the city of New York; and as so modified the order is affirmed, without costs. Settle order on notice.